[No. B041261. Second Dist., Div. One. Dec. 28, 1989.]

NANCY WAGNER, Plaintiff and Appellant, v.
GLENDALE ADVENTIST MEDICAL CENTER, Defendant and
Appellant.

**COUNSEL**

David Romley for Plaintiff and Appellant.

Proskauer, Rose, Goetz & Mendelsohn, Jeffrey A. Berman, Steven G. Drapkin and Barry B. Kaufman for Defendant and Appellant.

**OPINION**

**SPENCER, P. J.—**

### INTRODUCTION

Plaintiff Nancy Wagner appeals from a summary judgment entered in favor of defendant Glendale Adventist Medical Center.

### STATEMENT OF FACTS

In 1969, defendant hired plaintiff as a physical therapist to work in the rehabilitation institute. Upon seeking employment with defendant, plaintiff completed and signed an application form which stated in pertinent part: "I understand that if I am employed, . . . the employment may be terminated by either party at will upon two weeks' notice to the other." By 1976, plaintiff was a senior physical therapist.

In approximately June 1976, plaintiff was made rehabilitation coordinator of the rehabilitation institute. Thereafter, she received favorable reviews and one commendation for her work. As plaintiff acknowledges, through-

out her employment with defendant, the terms and conditions of employment were set forth in a series of employee handbooks. Each of these handbooks contained language stating, "Since employment in this hospital is based on mutual consent, either the employee or the hospital is privileged to terminate employment." By 1983, the language had changed to "terminate the employment relationship at will."

On February 18, 1986, plaintiff received a copy of the most recent employee handbook. It contained the same language referenced above as had the 1983 handbook. Attached to the 1986 handbook was a document entitled "Acknowledgement of Receipt of Employee Handbook." The document read: "I, Nancy Wagner, hereby acknowledge the receipt of the 'Employee Handbook' and realize that it is my responsibility to read it in detail so that I clearly understand the material within. I understand that it is the intent of the 'Employee Handbook' to give me some idea as to the policies and practices to which I will be subject. I further understand that this is not a complete manual. I realize that policies, practices, procedures, rules and regulations, compensation, benefits and insurance information may change from time to time and that this information will be available from my supervisor or the Personnel Department if I have questions. I also understand that employment in this Hospital is based on the mutual consent of the Hospital and the employee and, therefore, either the Hospital or I am privileged to terminate the employment at will." Plaintiff signed this document.

In January 1987, plaintiff was informed the position of rehabilitation coordinator was being eliminated. She was asked to leave immediately. Plaintiff later learned defendant was advertising in the Los Angeles Times for an individual to fill a position which seemed to her to be the same as the one she had held.

### CONTENTION

Plaintiff contends the trial court erred in ruling the parol evidence doctrine barred consideration of extrinsic evidence concerning any collateral agreement that she have permanent employment and be terminated only for cause; therefore, there remain triable issues of material fact rendering summary judgment improper. For the reasons set forth below, we disagree.

### DISCUSSION

A motion for summary judgment properly is granted where the "affidavits, declarations, admissions, answers to interrogatories, depositions and matters of which judicial notice . . . may be taken" in support of and in

opposition to the motion "show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subds. (b), (c).) ■ The party opposing a summary judgment has the burden of demonstrating that triable issues of material fact exist; unless that burden is met, summary judgment properly is granted. (*Los Angeles County-U.S.C. Medical Center* v. *Superior Court* (1984) 155 Cal.App.3d 454, 459 [202 Cal.Rptr. 222].)

Because the summary procedure is drastic, any doubts concerning the propriety of the motion are resolved in favor of the opposing party. (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851-852 [94 Cal.Rptr. 785, 484 P.2d 953]; *Garcia* v. *Wetzel* (1984) 159 Cal.App.3d 1093, 1095 [206 Cal.Rptr. 251].) Toward that end, the papers filed on behalf of the moving party are strictly construed while those of the opposing party are liberally construed. (*Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 285 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]; *Hooks* v. *Southern Cal. Permanente Medical Group* (1980) 107 Cal.App.3d 435, 442 [165 Cal.Rptr. 741].) Since the trial court's determination is one of law, based on the papers submitted, the reviewing court makes its own independent determination of the construction and effect of those papers. (*Hoffman* v. *Citadel General Assurance, Ltd.* (1987) 194 Cal.App.3d 1356, 1362 [240 Cal.Rptr. 253].)

The parol evidence doctrine prohibits the introduction of extrinsic evidence to vary or contradict the terms of an integrated written instrument. (Code Civ. Proc., § 1856; *Masterson* v. *Sine* (1968) 68 Cal.2d 222, 225 [65 Cal.Rptr. 545, 436 P.2d 561]; *Gerdlund* v. *Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 270 [235 Cal.Rptr. 279].) ■ The doctrine is based on the premise that the written agreement *is*, in those circumstances, the agreement of the parties. (*Ibid.*) In other words, the law "presumes a written contract supersedes all prior or contemporaneous oral agreements" (*Malmstrom* v. *Kaiser Aluminum & Chemical Corp.* (1986) 187 Cal.App.3d 299, 314 [231 Cal.Rptr. 820], citations omitted) and, where the writing is integrated, the presumption cannot be overcome. An integration may be partial, as well as complete; that is, the parties may intend that a writing finally and completely express certain terms of their agreement rather than the agreement in its entirety. (*Masterson, supra,* at p. 225.) The parol evidence doctrine applies equally to the partial integration. (*Ibid.*) Neither a noncontractual writing, such as a receipt or a mere memorandum, nor an incomplete writing is an integration. (2 Witkin, Cal. Evidence (3d ed. 1986) Documentary Evidence, §§ 973, 974, pp. 919, 920.)

■ The central question in determining whether there has been an integration, and thus whether the parol evidence doctrine applies, is "whether

the parties intended their writing to serve as the exclusive embodiment of their agreement." (*Masterson* v. *Sine, supra,* 68 Cal.2d at p. 225.) The question is one of law for resolution by the court (2 Witkin, *op. cit. supra,* § 970, p. 917), and thus will be resolved de novo by this court.

 The intent of the parties that the written agreement be integrated, i.e., a final and complete expression of one or more terms of an agreement, may be manifested even in the absence of an explicit statement to that effect and without signature. (2 Witkin, *op. cit. supra,* § 967, p. 915; Rest.2d, Contracts, § 209, subd. (1).) Thus, the court may consider evidence of surrounding circumstances and prior negotiations to determine whether the writing was intended as the final and complete expression of the parties' agreement. (2 Witkin, *op. cit. supra,* § 971, pp. 917-918.) In determining the issue, the court must consider not only whether the written instrument contains an integration clause, but also examine the collateral agreement itself to determine whether it was intended to be a part of the bargain. (*Masterson* v. *Sine, supra,* 68 Cal.2d at p. 226; *Gerdlund* v. *Electronic Dispensers International, supra,* 190 Cal.App.3d at pp. 270-271.) However, in determining the issue of integration, the collateral agreement will be examined only insofar as it does not directly contradict an express term of the written agreement; "it cannot reasonably be presumed that the parties intended to integrate two directly contradictory terms in the same agreement." (190 Cal.App.3d at p. 271.) In the case of prior or contemporaneous representations, the collateral agreement must be one which might naturally be made as a separate contract, i.e., if in fact agreed upon need not certainly have appeared in writing. (*Masterson, supra,* at pp. 227-228.) There are two writings at issue in the instant matter.

On August 4, 1969, plaintiff completed and signed an employment application. It is a preprinted form, two pages in length. While it has spaces for the applicant to indicate "choice of work" and "expected wage," it is not an application for a specific position at an agreed upon wage or salary. On the second page of the application, following a certification paragraph and a paragraph authorizing the release of information to the employer, there is a paragraph in small print, reading in pertinent part: "I understand that *if* I am employed, it will be for a trial period of three months; that *if,* in the judgment of the institution, I am unsuitable during this period, the employment may be terminated by the institution without notice; and that, after this period, the employment may be terminated by either party at will upon two weeks' notice to the other." (Italics added.) Given the contingent language used, as well as the lack of such essential terms as position and salary, it is clear the employment application is not intended as a full and complete employment contract. In actuality, it is a noncontractual document—a

mere solicitation of an offer of employment. As such, it cannot, in and of itself, be an integration. (2 Witkin, *op. cit. supra*, §§ 973, 974, pp. 919, 920.)

However, the parties may have intended the "at will" provision to be the final and complete expression of one term, incorporated into the contract of employment they ultimately concluded. To determine this issue, we must look at the surrounding circumstances. (2 Witkin, *op. cit. supra*, § 971, pp. 917-918.) In other words, the court must attempt to place itself in the same situation as that in which the parties found themselves at the time of contracting. (*Gerdlund* v. *Electronic Dispensers International, supra*, 190 Cal.App.3d at p. 270.) To do this, the court must receive provisionally all evidence offered to prove the intention of the parties, including evidence concerning any proffered prior or contemporaneous collateral agreement itself. (*Ibid.*)

In the instant matter, plaintiff proffered no prior or contemporaneous collateral agreement, relying solely on perceived express and implied assurances made several years after she initially accepted employment. In addition, it is clear there were no negotiations preceding the completion and execution of the employment application. Neither is there evidence of any contemporaneous personnel practices or employee guidelines to shed light on the actual terms of employment. Nonetheless, plaintiff acknowledged in deposition testimony that the employee handbooks reflected personnel policies, practices, rules and regulations, i.e., the terms and conditions of her employment.

The oldest handbook in evidence is one applicable in 1977. That handbook states in part, in a section entitled "Termination": "Since employment in this Hospital is based on *mutual consent,* either the employee or the hospital is privileged to terminate employment." (Italics added.) Although this provision does not use the words "at will," the concept of "mutual consent" embodies that principle. This portion of the handbook then lists various methods by which termination may be achieved, including resignation and dismissal. Dismissal is of special significance, for the handbook states a dismissal will be entered in the employee's personnel record and will become a permanent part thereof. Dismissal appears to be predicated solely on good cause, for the handbook states: "There are two general conditions that subject an employee to dismissal. [¶] A. Lack of adequate job performance[.] [¶] B. Misconduct . . . ."

While mentioning an employee's resignation and the requirement that the employee give two weeks' notice, the handbook makes no mention of a reciprocal procedure for termination without cause by the employer. It does, however, address termination during the three-month probationary

period, stating it may be "initiated by either the employee or the hospital at any time without notice." This is consistent with the language of the employment application, and suggests strongly that the parties intended the "at will" provisions of that application to be a final and complete expression of one term of their agreement, incorporated into their employment contract. The language of a 1981 employee handbook is entirely consistent with that of the 1977 handbook, as is that of a 1983 handbook. However, the latter document has added the words "at will" to the termination language. On balance, it appears the parties did incorporate the "at will" provisions into their employment contract.

It follows that the "at will" provisions of the application are a partial integration, i.e., a complete and final expression of this term of the parties' agreement, thus precluding any evidence of a prior or contemporaneous collateral agreement at variance with or in contradiction of this term. As noted *ante*, however, plaintiff does not rely on such a collateral agreement. ■ Rather, she relies on her perception that there were *subsequent* express and implied assurances in *modification* of the agreement.

Defendant argues there can be no implied modification of a prior written agreement, relying on *Shapiro* v. *Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467, 482 [199 Cal.Rptr. 613]. *Shapiro* does not stand for that proposition. In *Shapiro*, the court states: "There cannot be a valid express contract and an implied contract, each embracing the same subject, but requiring different results. [Citations.]" (*Ibid.*) The principle expressed is based on the reasoning that where the parties freely, fairly and voluntarily enter into a bargain, it would be inequitable to imply a different liability and to withdraw from one party benefits to which he or she is entitled under the contract. (*Wal-Noon Corp.* v. *Hill* (1975) 45 Cal.App.3d 605, 613 [119 Cal.Rptr. 646].)

In *Shapiro*, as in *Wal-Noon Corp.*, the oral representations alleged to create an implied contract were made contemporaneously with or prior to the execution of the written contract. The inequity in enforcing the implied contract in that situation is apparent. However, that is not to say the parties may not in that manner thereafter modify their agreement. ■ When one party has, through oral representations and conduct or custom, subsequently behaved in a manner antithetical to one or more terms of an express written contract, he or she has induced the other party to rely on the representations and conduct or custom. In that circumstance, it would be equally inequitable to deny the relying party the benefit of the other party's apparent modification of the written contract.

■ It remains to be seen whether plaintiff presented evidence of an implied modification affording her permanent employment subject only to

termination for cause. In opposition to the motion for summary judgment, plaintiff submitted a declaration to the effect that both Michael Weinper and Laverne Roth stated to her when contemplating expansion of the rehabilitation department "that they wanted my assurance that I would continue to permanently serve as Rehabilitation Coordinator. They specifically stated that they would expand the rehab department but only if I continued to stay on to do the marketing. I told Mr. Weinper that I would serve the Hospital forever as long as he realized that my family came first (meaning that I wanted to be able to accept phone calls from them at any time no matter what I was doing) and he acknowledged this. Also it was understood among myself, Mr. Weinper and Mr. Roth that I would work at the Hospital until my husband retired or if I wanted until I became 65. I also stated to Mr. Dan Bowers who was Administrative Director of rehabilitation, that I would be there long after he left because he was seeking the vice presidency and I was permanently the Rehabilitation Coordinator. He did not disagree with my statement."

However, deposition testimony plaintiff previously gave is at variance with the portion of her declaration quoted above. Plaintiff was asked what conversations and documents she relied upon as conferring on her permanent employment. In response, after detailing her efforts as rehabilitation coordinator upon assuming that position in 1976, the success of her efforts in filling the rehabilitation department and her consequent desire to expand the department, she noted she and Mr. Weinper "established an ad hoc committee to see where rehab could go in the future. . . . We got together with the vice president at that time, Leonard Yost, . . . and he brought in an outside firm, and we had our director of nursing from rehab, Margaret Caruso, . . . and we worked for the future of the rehabilitation institute . . . . That gives me an idea that my job there was permanent. I was in on the ground floor of building rehab to . . . what I brought it up to . . . . We worked on [expanding the rehabilitation department] every week for months and months and months. . . . Finally we established our long range plans . . . and we were at 100 percent occupancy at all times because of my marketing and the way I was doing things."

Plaintiff further testified she continued to add and fill beds "because I was on a roll." She testified defendant became the most successful rehabilitation unit in all of Los Angeles. "I built from nothing. Now, to me that established that this facility who appreciated what I was doing so much wasn't about to terminate me. I was giving 200 percent of my time. . . ." Plaintiff also mentioned that defendant agreed in 1979 to pay for her education and to retain her on full salary while she pursued a master's degree in rehabilitation administration. She then was asked whether there was anything else supporting the contention she had an understanding or guaranty or promise

or anything to that effect of permanent employment. She responded: "Sometimes those things are unwritten, but they are certainly implied the way people treated me."

Asked whether "there were any other facts that relate to the contention of permanency," she testified: "Our hospital does not give employees parking spaces. . . . Because I was going in and out of the hospital so often and . . . all over the City of L. A. . . . I asked for . . . and I was given a permanent parking spot . . . and when I left, my permanent parking spot was removed the next day. . . . We had a program evaluation report every year, and because of the good work in our census that was high, they would always say to me, 'Boy, you will be here forever, Nancy. You have done such a wonderful job.' So they named me the Madam of Rehab . . . because I filled the beds. So there was always an indication they will never get you out of here. 'You will never leave because you are absolutely . . . the Madam of Rehab.' " She further testified everyone made these statements: "Steve Forer, . . . who was in charge of program evaluations, Mark Johnson, . . . who was also in charge of program evaluations after Steve Forer, the administration directors that I have had in the past, both Mike Weinper and Dave Igler . . . . They said, you know, 'You are invaluable here. I don't know what we would ever do without you.' So it was verbally implied that you will be here forever . . . . I was invited by Mr. Roth, . . . who was president at the time of the [hospital] . . . to go to a retreat where they were planning the future of the hospital, and we were planning for the next three to five years . . . . [T]hat was in [1982] . . . . I was in the pension program, and I had planned on continuing to stay . . . for five more years, and then that would have given me 22 years with the company . . . ." She then indicated she could think of nothing else relating to permanency of employment.

In other words, in her deposition testimony, plaintiff was able to point to nothing other than the conclusions she drew from her "creation" of the expanded rehabilitation department, courtesies extended to her and her participation in a long range planning retreat, as well as expressions of appreciation for her efforts and implications she had made herself indispensable in the eyes of her superiors. She presented no evidence of oral representations her employment was in fact permanent, made by those with express or implied authority so to act, or that it was the custom and practice of the hospital to terminate long term employees only for cause. Her testimony thus directly contradicts the express representations of permanent employment and the "mutual understanding" she would remain until retirement which she details in her declaration.

Two months after she gave her deposition testimony, plaintiff attempted to "correct" the deposition transcript in the following manner: On April 28,

1988, her attorney wrote to defendant's attorney a "correction" letter which added to the deposition testimony a statement that she intended to remain five more years "or until I became sixty-five if I so desired." In addition, the letter added: "After approx. 1½ years with increased census, Mr. Weinper & Mr. Roth, who was the president of the hospital, told me that they wanted me to serve on a special committee for the purpose of expanding the rehab Institute's occupancy to 42-44 beds because of my tremendous success in marketing & that I would be a permanent part of the hospital.

"I told Mr. Weinper that I would serve the hospital forever as long as he realized that my family came first (meaning being able to accept phone calls from them at any time no matter what I was doing) and he acknowledged that. [¶] Also, it was understood that I would work at the hospital until my husband retired or if I wanted, until I became 65. Also, at one time I stated to Dan Bowers 'I will be here long after you leave because you are seeking a vice presidency and I am permanently the rehab coordinator.' He did not disagree. [¶] Over the years I turned down other employment offers and did not pursue other jobs where I could have made more money because I agreed to permanently work at the hospital as the rehab coordinator." These "corrections" mirror the pertinent contents of plaintiff's subsequent declaration and, like that declaration, directly contradict her prior testimonial admissions she relied on nothing more than her own impressions, courtesies extended to her and implications she had made herself indispensable.

■ As noted in *Burgon* v. *Kaiser Foundation Hospitals* (1979) 93 Cal.App.3d 813 [155 Cal.Rptr. 763]: " '[W]hen a defendant can establish his defense with the plaintiff's admission sufficient to pass the strict construction test imposed on the moving party, the credibility of the admissions are valued so highly that the contradicting affidavits may be disregarded as irrelevant, inadmissible or evasive [citations]. . . . There is no reason to draw a distinction between an attempt to counter an admission by affidavit and an attempt to counter an admission by changing the content of an answer given by a party directly in the deposition, especially where there is no assertion the original answer was incorrectly transcribed or the question was misleading or ambiguous. In both the changed affidavit and changed deposition cases the credibility of the parties is held up for examination by the contradicting statements, the first of which constitutes a reliable admission against interest. The trial court may accept the first and reject the latter of these contrary positions.' [Citation.]" (At p. 823.)

■ Here, defendant is able to establish from plaintiff's admissions the utter lack of any substance to a claim of an implied or express agreement her employment would be permanent. Thus, both the trial court and this

court are entitled to disregard the "corrections" she made to her deposition testimony and her contradictory affidavit. In sum, there is no reliable evidence of an express or implied modification of the "at will" provisions of her original employment contract.

On February 18, 1986, plaintiff received a copy of the then-current employee handbook attached to which was a document entitled "Acknowledgement of Receipt of Employee Handbook," bearing her employee number, 66150. This document provided: "I, Nancy Wagner, hereby acknowledge receipt of the 'Employee Handbook' and realize that it is my responsibility to read it in detail so that I clearly understand the material within. I understand that it is the intent of the 'Employee Handbook' to give me some idea as to the policies and practices to which I will be subject. I further understand that this is not a complete manual. I realize that policies, practices, procedures, rules and regulations, compensation, benefits and insurance information may change from time to time and that this information will be available from my supervisor or the Personnel Department if I have questions. I also understand that employment in this Hospital is based on the mutual consent of the Hospital and the employee and, therefore, either the Hospital or I am privileged to terminate the employment at will." Plaintiff signed this document.

The 1986 handbook no longer refers to "dismissal," but to "discipline," which "may consist of verbal warning, written warning, suspension without pay, and/or discharge depending on the seriousness of the infraction." It lists illustrative causes for discipline. Under the section entitled "Termination," the handbook states in pertinent part: "The information contained in this handbook is intended as a guideline and is not meant to create a contractual relationship, either express or implied, between the hospital and any one of its employees. [¶] Since employment in this hospital is based on mutual consent of the employee and the hospital, either the employee or the hospital is privileged to terminate the relationship at will."

■ Plaintiff directs the brunt of her attack on the trial court's ruling concerning the parol evidence doctrine at the acknowledgement she signed on February 18, 1986. She argues it cannot be viewed as an integrated agreement, relying on *McLain* v. *Great American Ins. Companies* (1989) 208 Cal.App.3d 1476 [256 Cal.Rptr. 863]. The document at issue in *McLain,* an employment application, contained an "at will" clause followed by a statement that " 'I also understand and agree that the terms and conditions of my employment may be changed, with or without cause, and with or without notice, at any time . . . .' " (At p. 1480.) Based in part on the latter language, the court concludes the employment application was not an integrated agreement, in that the language suggested the parties

intended specifically that the relationship remain subject to a change in the conditions of employment. (*Id*. at p. 1485.) As the court notes, the provision that the terms of employment could be changed at any time "strips the 'with or without cause' provision of its force. If the terms of [plaintiff's] employment could be changed, then it is conceivable that there was an implied contract that [plaintiff] could only be discharged for cause." (*Ibid*.) The court also addresses additional language in the employment application to the effect that the defendant had no authority to enter into an agreement " 'contrary to the foregoing.' However, this language seems to contradict the provision providing that the agreement could be changed and therefore appears to be ambiguous and confusing. Because the application was a standardized form, did not cover several key aspects of the employment relationship and because it expressly stated that the terms and conditions of employment could be changed, we conclude that it was not an integrated document." (*Ibid*.) Finally, the court concludes extrinsic evidence would in any event be admissible to explain the true meaning of the application, given the ambiguity therein. (*Id*. at pp. 1485-1486.)

Despite defendant's attempt to impugn and/or distinguish *McLain*, it appears clear the acknowledgement form cannot be considered an integrated agreement for the reasons expressed therein. It, too, is a standardized form missing key elements of the employment agreement; not only is it clearly not intended to embody the entire employment agreement between the parties, but it mentions one aspect of the relationship only incidentally. Most importantly, it also indicates a specific intent that the terms and conditions of employment remain subject to change.

However, there can be no implied contractual term completely at variance with an express term of a contract. (*Shapiro* v. *Wells Fargo Realty Advisers, supra*, 152 Cal.App.3d at p. 482; *Wal-Noon Corp.* v. *Hill, supra*, 45 Cal.App.3d at p. 613.) Tied as it is to the 1986 employee handbook, it is clear the language in the acknowledgement relating to the "at will" nature of the employment relationship is intended to restate a term of the employment contract as it exists at the moment, subject only to *future* change. In this respect, the instant matter differs from *McLain*, for there the plaintiff relied primarily on *subsequent* events: " 'the personnel policies or practices of the employer, the employee's longevity of service, [and] actions or communications by the employer reflecting assurances of continued employment.' " (*McLain* v. *Great American Ins. Companies, supra*, 208 Cal.App.3d at p. 1486.) In contrast, here, plaintiff relies on *prior* events. Thus, integrated or not, unless the then-existing implied term for which plaintiff contends is not completely at variance with the then-existing express term, it can have no force. It is obvious that an implied contractual term of permanent employment subject only to discharge for good cause is completely at vari-

ance with an express contractual term that employment may be terminated at will.

Moreover, as noted *ante*, plaintiff presented no reliable evidence of an implied collateral agreement of permanent employment subject to termination only for cause. In addition to ruling the parol evidence doctrine precluded consideration of plaintiff's extrinsic evidence, the trial court premised the summary judgment on the conclusion that, even if plaintiff's evidence were considered, it was insufficient to support the contention defendant "agreed, expressly or impliedly, that Plaintiff would be employed 'permanently' or that she could only be terminated for 'just cause.'" In this conclusion, the trial court was correct. ▉▉ ▉▉ ▉▉▉▉▉ Accordingly, any error in applying the parol evidence doctrine does not warrant reversal of the judgment.[1]

The judgment is affirmed.

Hanson, J., and Devich, J., concurred.

---

[1] After the trial court granted defendant's motion for summary judgment, defendant moved for the sanction of attorney's fees pursuant to Code of Civil Procedure sections 128.5 and 437c, subdivision (i), on the ground plaintiff had brought a frivolous action. The trial court denied the motion, and defendant cross-appealed from the order of denial. Defendant has abandoned the cross-appeal without explanation. Plaintiff relies on this abandonment as evidence the cross-appeal was frivolous and seeks sanctions therefor. In her view, it could have been brought for no other reason than an intention to intimidate her; thus, it was pursued for an improper motive. On the contrary, the cross-appeal might simply have been brought in haste, and the abandonment could have been motivated by a reconsideration of defendant's position and the conclusion the cross-appeal did indeed lack merit.

Plaintiff has suffered no harm from defendant's action. In view of the abandonment of the cross-appeal, there has been no "time-consuming and disruptive use of the judicial process"; it has not "tie[d] up judicial resources and divert[ed] attention from the already burdensome volume of work at the appellate courts." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 649-650 [183 Cal.Rptr. 508, 646 P.2d 179].) Thus, there is no basis for awarding sanctions.